# FAUL *v.* HULICK.

SURVIVORSHIP; PRESUMPTIONS; WILLS; BURDEN OF PROOF.

1. The common law (unlike the Roman law and the modern law of
   some countries and States derived or adopted therefrom), in-
   dulges no presumption of survivorship, whatever may have been
   the age, sex or physical condition of the respective persons who
   have lost their lives in a common disaster; but it requires evi-
   dence as the basis of its action.
2. Where a testatrix devises her estate to her son, and provides that
   if she shall become the survivor of her son, the estate shall go to
   a certain charitable institution, and she and her son perish in
   the same shipwreck, the death of the son in the lifetime of his
   mother is a condition precedent to the taking effect of the be-
   quest over, and the burden of proving that fact is upon the legatee,
   who will not take under the will unless such burden be discharged.
3. As between the next of kin of the testatrix, in such a case, and the
   personal representatives of the son, as the will vests the estate in
   the son immediately upon the testatrix's death, the son's represent-
   atives have a *prima facie* right to take, and will do so in the ab-
   sence of proof of the survivorship of the testatrix.

No. 1010. Submitted January, 18, 1901. Decided March 6, 1901.

HEARING on an appeal from a decree of the Supreme
Court of the District of Columbia in a proceeding by way of
interpleader to determine the rights of respective claimants
of a fund belonging to the estate of a decedent.  *Reversed.*

The COURT in its opinion stated the case as follows:

This case began with a bill of interpleader filed by the
administrators, with the will annexed, of the estate of So-
phia Rhodes, deceased.  After the payment of all claims
there remained in the hands of the administrators a fund of
$14,891.89 for distribution.  Of this there were three sets

of claimants, namely, the Young Women's Christian Home, a corporation of the District created by act of Congress; the next of kin of said Sophia Rhodes; and the administrator of the estate of Eugene Rhodes, deceased.

The will of Sophia Rhodes, after providing for the payment of debts, etc., and for an income for her husband, Oliver Wheeler Rhodes, contained the following items:

" Item 2. I now give, devise and bequeath unto my only and beloved son, Eugene Rhodes, all my property, real, personal and mixed, of whatsoever nature, kind or description, including moneys, credits and evidences of indebtedness of which I may be possessed at the time of my death, to be his absolutely, to hold and to dispose of as unto him may seem good and proper, and subject only to the provisions of item 1 of this last will and testament.

" Item 3. In the event of the death of my son, Eugene Rhodes, before the decease either of myself or of my husband, I then give, devise and bequeath all my property, everything I own on earth, as follows, viz.:

"1st. I give, devise and bequeath all my pictures and paintings to the Young Women's Christian Home, in the city of Washington, District of Columbia. It is my will that the said pictures and paintings may, so long as the said home shall exist, be the ornaments of the said home, with my name as the giver connected with them during that time.

" 2nd. All the rest and residue of my property, real, personal and mixed, I give, devise and bequeath to Michael H. Fitch, of Pueblo, Colorado, to have and to hold, in trust nevertheless, to invest the same to the best of his knowledge and experience, and to pay over the rents and profits arising therefrom to my husband, Oliver Wheeler Rhodes, during his, my said husband's life; and on the death of my said husband to turn over the said property, moneys, etc., with whatsoever accumulation thereon may be existing, to the Young Women's Christian Home, of Washington, in the District of Columbia, to be the property of the said home absolutely.

" Item 4. In the event of my becoming the survivor of both my husband, Oliver Wheeler Rhodes, and of my son, Eugene Rhodes, I then, give, devise and bequeath all my property, real, personal and mixed, of whatsoever nature, kind or description, to the Young Women's Christian Home, of the city of Washington, in the District of Columbia, to have and to hold the same absolutely and forever, for the good of that institution. It is my will that my pictures and paintings shall be disposed of in this event as provided in paragraph 1st, of item 3, of this last will and testament.

" Lastly. I hereby constitute and appoint my only son, Eugene Rhodes, the sole executor and trustee of this my last will and testament; and it is my will that my said sole executor and trustee shall administer and execute this last will and testament without giving bond therefor."

The case was submitted on the hearing below upon an agreed statement of facts, from which it appears:

1. That Eugene Rhodes was the only child or descendant of Sophia Rhodes and Oliver W. Rhodes, and John L. French is the duly appointed administrator of his estate.

2. That the said Oliver Wheeler Rhodes departed this life in the District of Columbia on the 27th day of January, 1895; that his said wife and son were at that time in Heidelberg, Germany; that, being advised of his extreme illness, they started for Bremen to take the next steamer home, receiving a cablegram announcing his death a few hours before they sailed; that they sailed on the steamer " Elbe " at three o'clock P. M., on Tuesday, January 29, 1895, both occupying the same stateroom; that about 5:30 o'clock the next morning, as the ship was going in a southwesterly direction and was about due west of The Hague, she collided with the steamer " Craithie," en route northwesterly from Rotterdam to Scotland, the point of penetration being on the same side and deck of the " Elbe " and about eight feet abaft of the room occupied by the said testatrix and her son. In about twenty minutes thereafter the "Elbe" went down. One lifeboat, No. 3, got away with twenty-one survivors. Lifeboat

No. 5, filled mostly with women, capsized on being lowered to the water and all of its occupants were lost except one Anna Bocker, hereinafter referred to, who succeeded in getting into boat No. 3. Six weeks thereafter, March 6, 1895, the said Eugene's body came up in a fishing net off the coast of Holland; the mother's body was never recovered.

3. The testatrix was about fifty-two years of age at the time of her death, was corpulent of figure, and short-winded in breathing. Her son was about twenty-three years old, was rather a good swimmer, had never been married, and he died intestate.

4. The said Sophia Rhodes' next of kin, if she survived her said son, were and are her brother and sister, Andrew Waesner and Barbara Faul, defendants herein. If her said son survived her his next of kin were said Andrew Waesner and Barbara Faul, on his mother's side, and on his father's side John G. Rhodes, Melville D. Rhodes, and Mrs. Alice Fitch, brothers and sisters of his father. The said John G. Rhodes has since died, leaving a widow, Katherine Rhodes, of Georgetown, Ohio, and five children, viz., Mrs. Mary R. Story, of Cincinnati, Ohio; Mrs. Belle R. Latham, Burlington, Iowa; Miss Genevieve Rhodes, Cincinnati, Ohio; White Rhodes, Georgetown, Ohio, and John Rhodes, Nashville, Tennessee.

5. That of the twenty-one persons known to have survived shipwreck two only, Miss Anna Bocker and John Vevera, have any personal knowledge tending to show the respective movements and situation of the said Sophia Rhodes and Eugene Rhodes, her son, at the time of the disaster aforesaid and immediately preceding their death; and it is further agreed that said Anna Bocker, if produced as a witness on behalf of the defendant John L. French, would testify, and the following is to be taken as her deposition to the effect, that just after the collision she saw the testatrix come out of her cabin, clothed in a blanket over her night-dress, as if to see what the matter was, and that she, the witness, never saw the said Mrs. Rhodes afterward; that subsequently (certainly some minutes after) when she, Miss

Bocker, went on deck she saw the said Eugene Rhodes just in front of her, and never saw him afterward; and that the said John Vevera, if produced as a witness in behalf of said Waesner and Faul, would testify, and the following is to be taken as his deposition to that effect, that he is a resident of the city of Cleveland, county of Cuyahoga, Ohio, residing at 339 Burton street; that he has lived in said city for twenty-six years last past; that from 1893 to 1896 he was a member of the board of county commissioners of Cuyahoga county, Ohio; that since the 1st day of January, 1896, he has been and now is in the real estate and insurance business in the city of Cleveland; that he was in Europe in the latter part of 1894 and took passage to return to this country on the steamship "Elbe;" that on the night preceding the disaster to this ship he sat at the same table with a mother and son; that his attention was attracted to them, as they seemed so happy and as the mother seemed so much interested in the boy, and that shortly thereafter he learned that the name of the woman was Mrs. Sophia Rhodes, and that the young man was her son; that after the accident which occurred on January 30, 1895, when every one was on the deck, he saw these parties on the left side of the boat. The mother had her arms thrown around the neck of her son in a grip that he thought she would never lose, and the son was endeavoring to put a shawl around her to protect her from the cold.

When affiant first came on the deck he went to the life-boat on the right-hand side of the vessel, but found it filled with ladies, and no man was allowed to enter the boat, but after it left the vessel a short distance it was swamped. Affiant then fought his way over to the left-hand side, further to the rear; had to fight his way through a crowd of sailors who were keeping every one back. As he got to the side of the vessel a man was standing there with an ax. A friend of affiant's who immediately preceded him was struck down, but affiant succeeded in overcoming the man with the ax and jumped over the side of the vessel, and that he was the last one to get into the lifeboat, and was cut by the ax on his wrist.

The time he saw Mrs. Rhodes and her son last was just prior to his jumping over the side of the vessel. Affiant further states that it would have been impossible for them to have gotten through the sailors, who were keeping everybody back; that he was the last one to get into the lifeboat, and at the time he got in he was the nineteenth man in the boat. They endeavored to throw him out of the boat, but they did not succeed.

Affiant further says that he is positive that Mrs. Rhodes and her son remained together on the deck, as the boat in which he succeeded in escaping was the last one to leave the ship; that the scene made an impression on his mind that he will never forget; that after the boat in which he had gotten was some distance away the ship went down with a lurch and every one on board was drowned; that both of these parties died together, and, so far as this affiant was able to learn, after he saw these parties on the deck clasped in an embrace that would never be loosened until after death, no one else saw them; that he has no interest in this case and his acquaintance with the parties was simply by reason of his attention being attracted to them and the fact that when he last saw them the mother and son were standing in the manner he has stated.

Upon the foregoing facts it was decreed that the Young Women's Christian Home was entitled to the fund, and it was ordered to be paid over accordingly. From that decree all of the other parties have appealed.

*Mr. J. M. Wilson* and *Mr. A. A. Hoehling, Jr.,* for the appellants, Barbara Faul and Andrew Waesner:

1. Where two or more persons perish in a common disaster, and the order of their deaths is unascertainable by evidence, there is no legal presumption of survivorship in favor of any such persons, and in such case property rights are disposed of as if death had occurred to all at the same time. *The King* v. *Hay,* 1 Wm. Blackst. 640; *Wright* v. *Sarmuda,* decided in 1793 by Sir William Wynne; *Taylor* v. *Diplock,*

2 Phill. 261.    See, also, *Murray,* 1 Curteis, 406, and *Satterthwaite* v. *Powell,* 1 Curteis, 429.

There were two, possibly three, cases in which the English courts seemed to indulge in a presumption of survivorship or of codemise.    See *Sillick* v. *Booth,* Younge & Collyer Ch. Rep. 121, and *In re Selwyn,* 3 Hagg. Eccl. Rep. 748.    But the question was finally and definitely settled in *Underwood* v. *Wing,* 19 Beav. 459, which is now universally accepted, both in England and in this country, as correctly expounding the common-law doctrine.    In that case it was held that, in the absence of evidence, it could not be assumed that either of two persons lost in a common disaster was the survivor.    The case was appealed, and again exhaustively discussed, but with the same result.    4 De G., M. & N. 633.    The case then went to the House of Lords, with a like result, the decisions below being approved.    8 H. L. 183. Since that case the law has been definitely settled in England on the basis of that decision.    See, also, Greenleaf on Evidence, vol. I, Secs. 29 and 30; Taylor on Evidence, Secs. 202 and 203; Best on Evidence, pp. 393, 394; Wharton on Evidence (2d ed.), Sec. 1280, and 2 Kent's Commentaries (13th ed.), Sec. 435; *Coye* v. *Leach, Adm'r.* 8 Met. 371; *Russel* v. *Hallet,* 23 Kan. 276; *Ehle's Estate,* 73 Wis. 445; *Johnson* v. *Merrithew,* 80 Me. 111; *Newell, Ex'r, et al.* v. *Nichols,* 12 Hun, 607; S. C., 75 N. Y. Ct. App. 78; *Cowman et al., Ex'rs,* v. *Rogers et al.,* 33 Md. 403.

Such was also the rule of the Danish law.

2. It is not permissible, under the guise of construction, to incorporate distinct provisions into a will, nor to insert therein conditions or contingencies not provided for by the testatrix.    2 Redfield on Wills, 283; 1 Roper on Legacies, 750.    See, also, *Illinois Land and Loan Company* v. *Bonner,* 75 Ill. 317, and *Heald* v. *Heald,* 56 Md. 300, 313; *Gibson* v. *Seymour et al.,* 102 Ind. 485; *Rupp* v. *Eberly,* 79 Pa. St. 141.

The court below, in its opinion, refers to several authorities, particularly decisions of the Supreme Court of the United States, which are apparently cited in support of

the court's holding; but those authorities, it is respectfully submitted, do not sanction the changing of a will, as was done in this case. Those cases are: *Finley et al.* v. *King's Lessee,* 3 Pet. 346; *Clark* v. *Boorman's Executors,* 18 Wall. 493; *Colton* v. *Colton,* 127 U. S. 300; *Lee* v. *Simpson,* 134 U. S. 572; *Robison* v. *Orphan Asylum,* 123 U. S. 702; *Metcalf* v. *Framingham Parish,* 128 Mass. 370, 374.

In none of these cases did the court sanction the changing of a will, by construction, by incorporating therein a distinct provision and condition.

Redfield, in his work on Wills (vol. 1, 4th ed.), has expressed, with evident care and with clearness, the rules followed by courts in the *construction* of wills, and the extent to which courts may go in respect of such matter. An heir can only be disinherited by express devise or necessary implication, and that implication has been defined to be such a strong probability that an intention to the contrary cannot be supposed. 1 Jarman on Wills, 465; *Rupp* v. *Eberly, supra.*

3. The decree of the court below was further erroneous in so far as it undertook to dispose of property not embraced in the bill of interpleader and not within the jurisdiction of the court.

*Mr. J. W. Smith* and *Mr. Wm. Henry Dennis* for the administrator and appellant, John L. French:

*Mr. John B. Larner* and *Mr. J. J. Darlington* for the appellee, the Young Women's Christian Home:

1. The testimony relied upon on behalf of the claimants through the son is, in brief, that he, being the younger, stronger, and a good swimmer, should be presumed to have survived. That, under the common law, evidence of this character is insufficient to create any presumption upon which courts can act, is established by the authorities, from the earliest times and uniformly. The rule is variously stated, either that, in the absence of evidence to prove the

fact, both parties will be presumed to have died at the same time, or that the course of distribution and descent will be the same as if the deaths had been simultaneous. *Bradshaw* v. *Toumlin,* 2 Dick. 633; *Wright* v. *Samada,* 2 Phill. 261'; S. C., 2 Salk. 593; *Satterthwaite* v. *Powell,* 1 Curteis, 705; *Durrant* v. *Friend,* 5 DeG. & Sm. 343; *Barnett* v. *Tugwell,* 31 Beav, 232.

In *Underwood* v. *Wing,* 19 Beav. 459, H. L. Cases, 183, the Master of the Rolls, the Lord Chancellor, and the House of Lords concurred in the conclusion that, under the common law, there could be no presumption, in the absence of proof, of prior decease, although the husband was in good health, a very strong and powerful man and an able swimmer, while his wife was in delicate and weak condition, and their sons of tender age; and this has ever since been the accepted conclusion in the English courts. *In re Wainright,* 1 Swab. & Trist. 257; *In re Ewart,* 1 Swab. & Trist. 258; *In re Wheeler,* 31 L. J., P. & M. 40.

In America, the current of authority is to the same effect, a leading case being that growing out of the loss at sea of Mrs. Ridgeway, sixty-nine years of age; her son-in-law, forty-five years of age, and her grandchildren, aged ten and seven years, out of which grew *In re Ridgeway,* 4 Redf. 226; *Stinde* v. *Goodrich,* 3 Redf. 87; *Newell* v. *Nichols,* 12 Hun, 604, and *Newell* v. *Nichols,* 75 N. Y. 78, all holding that there is no presumption of prior decease in cases of this character, without evidence tending to prove the fact.

To similar effect is *In re Hall,* 9 Central Law Journal, 381; *Johnson* v. *Merithew,* 80 Me. 111; *Cowan* v. *Rogers,* 73 Md. 403.

2. The contention of the parties claiming through the testatrix herself is the technical one that her will should fail, because, technically, it gives her estate to her son only in the event that he survived her, or to the Young Women's Christian Home only in the event that she survived him, neither of which events, as a matter of fact, can be certainly determined.

It is submitted, both upon principle and upon authority,

that this cause should be decided upon a broader principle
than either of these opposing claims; namely, upon the
principle that a will is to be construed, not according to
its letter, but according to its intent, and that mere verbal
omissions, or strict literal criticisms or interpretations, are
not to defeat the obvious wish of a testator, where the real
intention is sufficiently plain.

The principle here urged, and the reasons for it, may be
illustrated by what is believed to be the only case opposed
to it, namely, that of *Underwood* v. *Wing,* reported in the
House of Lords under the title of *Wing* v. *Angrave,* 8 H.
L. Cases, 183.

In that case, Mr. Underwood and his wife, together with
their three children, were lost at sea. He left a will devis-
ing and bequeathing all his estate to William Wing, in
trust for his wife if she survived him, in trust for their
children if the wife should die; but, should the children
die before attaining the age of twenty-one years and unmar-
ried, then the whole estate to be the property of Mr. Wing.
The wife, also, left a will, devising and bequeathing her
property to Mr. Wing, for his sole use and benefit, in case
her husband died in her lifetime, and subject to the chil-
dren's interests.

Under these wills, both the husband and wife, together
with their children, having died practically simultaneously,
it was clearly the intent of both testators that their estates
should pass to Mr. Wing; and this view of the matter was
presented in the House of Lords by Lord Campbell, in his
dissenting opinion, with great clearness and force. See 8
H. L. Cases, 199. The case was decided, it is true, upon
the narrower ground that, as Mr. Wing could not show
either that the death of the husband occurred in the wife's
lifetime or that the wife's death occurred in the husband's
lifetime, he could receive neither estate; and as has been
well commented upon the case, the result was that the
courts were led " to make a new will for both the Under-
woods, whereby they entirely set aside the family friend,
whom both husband and wife had endeavored to honor, and to

substitute in his place a person whom both had labored to
exclude from participation in their estates." In this result,
it is believed, *Underwood* v. *Wing* has never been followed
by any other court. In instances of intestacy or cases of
analogous nature its conclusion that there is no presumption
of survivorship, either from relationship, age, relative con-
dition of health or the like has been followed, it is believed
uniformly; but we have found no other case in which the
manifest intent of the testator has failed of effect through
technical and literal adherence to the language of the will,
without regard to its spirit and intent.

It is claimed by the other side that the doctrine of *Under-
wood* v. *Wing* has never been questioned, but has since been
accepted by all courts as the undisputed doctrine governing
in such cases. This claim is substantially true in so far as
*Underwood* v. *Wing* repudiates the proposition that the fact
of survivorship can be determined upon the speculative, un-
certain and unsatisfactory conjectures to which age, sex and
physical conditions may give rise; but it is believed that no
case can be found in which the doctrine of the case in ques-
tion has been recognized or followed in its subordination of
the plain, manifest intent of the testator, to the strict letter
of the language employed in the instrument.

Of the cases cited in the opposing briefs, *Russell* v. *Hal-
lett,* 23 Kan. 194; *Johnson* v. *Merithew,* 80 Me. 111; *Cow-
man* v. *Rogers,* 73 Md. 403, and *Ehle's Estate,* 73 Wis.
445, are cases in which no question of the construction of
wills was involved, there being no will in any of them ex-
cept *Ehle's Estate,* and, in that case, the circumstances
establishing the fact satisfactorily that the testator was the
first to die, and no question either of following or of frus-
trating the testator's intent being involved.

The only case, it is believed, subsequent to *Underwood* v.
*Wing* and involving any similar question as to the construc-
tion of a will, is that of *Newell* v. *Nichols,* 12 Hun, 604,
affirmed in 75 N. Y. 78; and in that case the decisions of
both the lower and the appellate tribunal were contrary

to that in *Underwood* v. *Wing,* and in entire harmony with the decision of the court below in the present case.

The principle here contended for, namely, that the intent of the testator is to be given effect, without regard to a literal adherence to the language used, where such literal adherence would defeat the testator's manifest desire, is laid down in all the text-books and authorities, and is illustrated by many decided cases. · See Willes Reports, p. 682; *Town* v. *Wentworth,* 11 M. P. C. 520; *Abbott* v. *Middleton,* 7 H. L. Cases, 68; S. C., 21 Beav. 143; *Liston* v. *Jenkins,* 2 W. Va. 62, and cases cited; *Cox* v. *Britt,* 22 Ark. 567, and cases cited; *Chapman* v. *Brown,* Burr. 1635; *McKeehan* v. *Wilson,* 53 Pa. St. 74; *Aulick* v. *Wallace,* 12 Bush, 531; *In re Redfern,* 6 Ch. Div. 133; *Doe dem. Leach* v. *Micklem,* 6 East, 486; *Eatherly* v. *Eatherly,* 1 Cold. 461; *Freeman* v. *Freeman,* 8 Vin. Abr. Tit. Devise, 51; *Sessoms* v. *Sessoms,* 2 Dev. & B. 453; Perry on Trusts, Sec. 724; *Key* v. *Key,* 4 DeG. M. & G. 73; *Pearsoll* v. *Simpson,* 15 Ves. 29. The opinion in the last cited case is referred to, approved and followed by the Supreme Court of the United States in *Robinson* v. *Portland Orphan Asylum,* 123 U. S. 702, a case, also, bearing a close analogy in principle to the case at bar.

Among many other authorities stating the principle may be cited *Smith* v. *Bell,* 6 Pet. 68, 80; *Patch* v. *White,* 117 U. S. 210; *Newell* v. *Nichols, supra, et passim.*

An authority apparently in opposition to this view is cited in the brief on behalf of the appellants, Faul and Waesner, namely, the case of *Gibson* v. *Seymour,* 102 Ind. 485. This case would seem to be distinguishable in its facts and in its circumstances from the case now under consideration, and to fall under the observations of the Supreme Court of the United States in *Robinson* v. *Portland Orphan Asylum, supra.*

The application to the present case of the principle established by these authorities is plain. No one can read Mrs. Rhodes' will without recognizing, beyond the possibility of a doubt, that she intended to dispose of the whole of her

estate, and that, unless her son lived, in the language of the Supreme Court in 123 U. S., p. 709, "to receive the gift intended," she purposed that it should pass to the Young Women's Christian Home. There is no room for question or dispute over these propositions; the only controversy possible is, whether the language employed to carry out this unmistakable intention is to be construed with a critical liberalness which shall defeat it, or whether "the intention is to be carried into effect, where apparent, although expressions must be discarded or modified to effectuate that purpose" (*Town* v. *Wentworth, supra*); whether, in the words of Lord Mansfield, "implication shall supply verbal omissions, the letter shall give way, every inaccuracy of grammar, every impropriety of terms, shall be corrected by the general meaning, if that be clear and manifest" (*Chapman* v. *Brown, supra*); whether the construction of the will shall be made "to depend much more upon the evident intent of the testator than upon the strict import of any term that he may make use of" (*Lambert's Lessee* v. *Paine, supra*); whether the clearly perceived intent "must prevail, although in giving effect to it some words should be rejected or so restrained in their application as to change their literal meaning in the particular instance" (*Finlay* v. *King's Lessee,* 3 Pet. 377).

Mr. Justice SHEPARD delivered the opinion of the Court:

1. All that is certainly shown in the evidence agreed upon by the parties is, that the testatrix, Sophia Rhodes, and her son, Eugene, perished in the same disaster. There is no evidence upon which to base a judicial opinion that either survived the other; and in adjudicating the rights of those claiming under either of them the order of their deaths must be considered as judicially unascertainable.

Unlike the Roman law, and the modern laws of some countries and States derived or adopted therefrom, the common law indulges no presumption of survivorship, whatever may have been the age, sex, or physical condition of the

respective persons proved to have lost their lives in a common disaster. It requires evidence as the basis of its action.

It would prove a useless consumption of time to review the older cases in England involving this question; for whatever doubt may have existed by reason of certain expressions used in some of them, has been finally set at rest by the decisions in two noted cases — one by the Lord Chancellor with the aid of two common-law judges, and the other by the House of Lords. *Underwood* v. *Wing,* 4 DeG. M. & G. 633; *Wing* v. *Angrave,* 8 H. L. Cases, 183.

The American courts before which the question has come have enounced the same doctrine substantially. *Coye* v. *Leach,* 8 Metc. 371; *Newell* v. *Nichols,* 75 N. Y. 78; *Cowman* v. *Rodgers,* 73 Md. 403; *Russell* v. *Hallett,* 23 Kan. 194; *Johnson* v. *Merithew,* 80 Me. 111; *Estate of Ehle,* 73 Wis. 445; *Smith* v. *Armistead,* 7 Fla. 81; *Paden* v. *Briscoe,* 81 Tex. 563.

2. Admitting the rule of the common law as stated, and assuming that the order of death of mother and son in this case is unascertainable from the evidence, it has been contended that the property rights of those who claim under each decedent must be determined as if death occurred to each at the same instant. This view seems to have support in the language used in its opinions delivered in some of the American cases above cited, but we cannot accept it as logical and sound. It seems to us nothing less, in reality, than the substitution of one presumption for another — the, if anything, more unreasonable presumption of simultaneous death, for the rejected presumption of survivorship. Presumptions failing, the law requires evidence as a foundation for action upon either hypothesis. On application to the courts, there is always a burden of proof, slight though it · may often be, upon him who has the affirmative, and if he fails to discharge it with evidence reasonably sufficient for the purpose, he must suffer the consequences of failure. His opponent succeeds, not upon proof of his own case or defense, but by reason of the absence of evidence on the necessary point.

In our opinion, therefore, the distribution of the personal estate of which Mrs. Sophia Rhodes was possessed at the time of her death must depend upon the ascertainment of the party whose position in the case is such that he must succeed because of the failure of evidence to establish the essential fact of survivorship.

3. The claim of the Young Women's Christian Home will first be considered.

If the will is to be construed as making the death of Eugene Rhodes, in the lifetime of his mother, a condition precedent to the taking effect of the bequest over, then it is quite clear that the burden of proving that fact is thrown upon the legatee and has not been discharged.

The question now occurs, and it is to it that the weight of the argument has been directed: Whether the will is to be so construed?

The contention on behalf of the legatee is, substantially, that the obvious intention of the testatrix was to avoid intestacy absolutely, and that the Home should take her estate not only upon the event expressly provided for, but also in case, as here shown, where her son, who was the first object of her bounty, could not possibly survive to take any practical benefit.

The argument in support of this contention prevailed with the learned justice who presided at the hearing and determined the decree rendered. It was conceded by him, as his opinion in the record shows, that, giving the words of the fourth item "their literal meaning, it must be held that the contingency therein named has not been shown to have happened." But he was of the opinion that the general intention of the testatrix that the Home should have the benefit of her estate, if her husband and son were not able to take beneficially, was so apparent, the will must be construed as if either of the following clauses had been inserted therein by the testatrix:— " Or in the event that my husband and son die at the same time with me," — " or in the event that my husband and son do not survive me."

We are constrained to differ from this conclusion. It is

undoubtedly true, that " the intent of the testator is the cardinal rule in the construction of wills; " but this intention must be found in the language of the will itself. Where such general intention is found, considerable latitude has been permitted in the way of rejecting the literal meaning of some words when irreconcilable with the context, and even in supplying words to give effect to this general intention, where it is plain that the testator has incompletely expressed his apparent meaning, and it is also plain what those words are which he must have meant to use, and yet, through negligence or ignorance, omitted. In such cases the construction is founded on the apparent condition of a contingency, or state of circumstances, present in the mind of the testator at the time, and which he has imperfectly described or provided for. But when the testator has evidently overlooked, or failed to apprehend, a particular contingency which might occur and change the course which his estate would otherwise take, the courts are not at liberty to read into the will a clause providing for that contingency, although they might believe generally that the testator would have inserted it had attention been called to it when the will was written and executed.

This very question was involved in the case of *Wing* v. *Underwood,* 4 DeG. M. & G. 633, 654, and after careful consideration the decision was against the construction contended for. The condition upon which the bequest to Wing depended was: "And in case my wife shall die in my lifetime, then," etc. Husband and wife perished in the same shipwreck, and there was no proof of survivorship. Lord Chancellor Cranworth, in disposing of the question, said:

" The gift to Mr. Wing is in terms made dependent, and was evidently meant to be dependent, on the single event, setting aside the children, of the testator surviving his wife: If she should survive, he gives everything to her, if she dies in his lifetime he gives everything to Mr. Wing; it is impossible to say that there is any third case, or class of cases, to which the language of the will could possibly be appli-

cable. It may be that, if the extremely improbable event which did occur had presented itself to the testator's mind as a possible contingency, he would have wished Mr. Wing to take his property; but then he would have done this, not by relying on the words now found in the will as being sufficient for the purpose, but by making express provision to accomplish his object.

" It is not sufficient to say that, if for any reason the gift to the wife fails to have practical operation, the testator must have intended to benefit Mr. Wing; the answer is, he has not said so, neither expressly nor impliedly; and if I were to attempt to supply the omission I feel that I should be making, not construing, the testator's will."

The same question was later considered in the House of Lords in the case arising under the will of Mrs. Underwood, which gave her property to Wing also, in case her husband should die in her lifetime, and the same decision followed. *Wing* v. *Angrave,* 8 H. L. Cases, 183, 207, 215, 223. In giving his opinion, Lord Wensleydale said:

" No one can doubt as to the testatrix's ' intention,' in the loose sense of that word. No one can suppose that she really meant not to give the property to Wing, if her husband and herself should happen to die at the same moment. No one doubts that, had she thought of such a possibility at the time she made her will, she would have provided for it by express words. But it cannot be too often repeated, that the true question in all these cases is, not what the testatrix intended to do, but what is the meaning of the words used in the will."

In the same case, Lord Chelmsford used the following language, which seems to us directly applicable to the conditions of the case at bar:

" In forming my judgment in this case, I have had to struggle with my strong inclination so to construe the will as to give the appellant the benefit under it, of which he has been deprived by a singular and unforeseen accident. I would gladly have found anything which either expressly or by necessary implication manifested an intention that

he should take at all events upon the failure of the gift to Mr. Underwood.

" But it must be conceded, that the event which has happened was so extraordinary and improbable, that it was not likely to have ocurred to the mind of any one, and, therefore, no provision for it could have been contemplated. We may, indeed, speculate with great probability, if not with certainty, as to what the form of bequest would have been, if the possibility of such event had been suggested; but to act upon such a speculation would be to make the will speak a different language for the purpose of satisfying an intention which could not have been conceived, and, therefore, could never have been meant to be expressed."

Another omission of this will tends to illustrate the impropriety of giving it the construction founded upon what has been aptly called, " the testatrix's ' intention ' in the loose sense of that word." No provision is made for the contingency of Eugene Rhodes' death leaving issue. Consequently, upon the construction contended for, if he had married and left a child surviving him, that child would be cut out. This contingency, far more likely of apprehension than the one that did happen, was no more present in the mind of the testatrix than was the other. And there is nothing in the will or the circumstances surrounding the parties, that would justify any other conception than that had it occurred to her she would have provided for it by apt words for the purpose.

The case of *Newell* v. *Nichols,* 75 N. Y. 78, which is the authority most strongly relied on by the appellee, appears to us to be distinguishable.

The will vested the entire estate in trustees for the purpose of raising certain specified funds. The interest upon one fund was directed to be paid to a daughter during her life, with remainder to the heirs of her body, if then living. In default of heirs of her body living at the time of her death, she had the power to appoint by will to whom she pleased. In default of said heirs living at the time of her death, or of the exercise of the power, the remainder was to the

heirs of the heirs of the body of the testatrix, then living, and in default of these, over to the heirs of Frederick Ridgway and others. A like fund was to be raised for the benefit of her son upon corresponding limitations. A third fund was to be raised for the benefit of her husband during his life, with remainder to the heirs of testatrix's body then living, and in default of such heirs living at the time of her death, then over to Ridgway and others also. After the death of testatrix, her husband and mother, and the two children who were under the age of ten years, were lost in the wreck of the steamship "Schiller," and there was no evidence from which survivorship could be ascertained. It was held, that the property had never vested in the children under the will, but the title had remained in the trustees until their death — the trust being valid and active, title was necessary to its execution; that the remainder over was a conditional limitation and not a condition precedent; and that the intent of the will was that it should be effectual if for any reason the children could not take. Following *Wing* v. *Angrave,* in respect of the doctrine of presumption, it was held that the appellants, who claimed under the two children, were charged with the burden of proving their title to some specific share or interest, and were not aided by their alternative claims. It was said by Chief Justice Church, who delivered the opinion of the court: "As to the daughter's share there was a failure to prove a title because it does not appear that the son survived the daughter, and the same is true of the share of the son."

The court also, incidentally, recognized the distinction between the will of Mrs. Ridgway and that of Mrs. Underwood, by agreeing that the survivorship of the latter was a condition precedent to the taking of an interest by Wing.

In the next case relied on, the will is very different from the one under consideration. *Robison* v. *Portland Orphan Asylum,* 123 U. S. 702. From the terms of the will in that case, it was plain that the widow of the testator was intended to take an interest for life and nothing more, and that the testator wished to avoid intestacy in any event. But no

distinct words were read into the will to effectuate the afore-
said intention. The words, "at their death," which de-
scribed the commencement of the gift over to the defend-
ants, were reconciled with this plain intention, by ·taking
them as indicating only the expectation of the testator,
which he naturally indulged, that the beneficiaries named
would not live to receive the gift intended, and not as re-
quiring that the gift shall take effect at that time irrespective
of the prior decease of the widow.

The final conclusion was stated as follows: " The limita-
tions in the two subdivisions of the will are to be taken in
connection with each other as a complete disposition in the
mind of the testator of his estate, giving to the widow an
estate for life, with an estate over for life to Ann Smith and
Eleanora C. Robinson, contingent upon one or the other of
them surviving the widow, with the ultimate remainder to
the defendants."

4. Having disposed of the claim of the Young Women's
Christian Home, the next question for consideration is:
Upon whom lies the burden of proof as between the next of
kin of Sophia Rhodes and the administrator of Eugene
Rhodes?

One contention is, that the *prima facie* right is in the
next of kin of the mother, whose estate is to be distributed,
and that the burden of proof rests upon the representative
of the son to displace them by showing his survival. This
proposition has support in a number of decisions, some of
which seem to be directly in point, while others are more
or less analogous. *Coye* v. *Leach,* 8 Metc. 371; *Johnson* v.
*Merithew,* 80 Me. 111; *Russell* v. *Hallett,* 23 Kan. 194;
*In re Green's Settlement,* L. R. 1 Eq. 288; *In re Phene's
Trust,* L. R. 5 Ch. App. 139.

On the other hand, the contention is, that upon the death
of the mother descent was immediately cast upon the son,
and, therefore, the burden lies upon the next of kin of the
mother to show the prior decease of the son; in other words,
that it is incumbent upon them to show the extinction of the
intervening, preferential right of the son's representatives.

The argument in support of this contention is founded upon the supposed analogy to the rule that prevails, in this jurisdiction, in actions of ejectment, which is: That the burden is upon the plaintiff to show not only his descent from some common ancestor with the person last legally seised, but also the extinction of all lines of descent that could take in preference. *Posey* v. *Hanson,* 10 App. D. C. 496, 505, and cases cited. See, also, *Skinner* v. *Fulton,* 39 Ill. 485, 495; *Emerson* v. *White,* 29 N. H. 482, 492; *Bates* v. *Schraeder,* 13 Johns. 260; *Stinchfield* v. *Emerson,* 52 Me. 465; *Payne* v. *Payne,* 29 Vt. 172; *Anson* v. *Stein,* 6 Iowa, 150, 152; *Delany* v. *Noble,* 3 N. J. Eq. 441, 445. And the rule seems to be substantially the same where the action is to recover, or establish a claim to personal property. *Schneider* v. *Piessner,* 54 Ind. 524, 525; *Gardner* v. *Kelso,* 80 Ala. 497, 501; 2 Woerner Law Admn. 1234; *Underwood* v. *Wing,* 4 DeG. M. & G. 633, 655, 659. In the last case it was said: " The next of kin stands as to personalty in the same position as the heir-at-law as to realty and the person claiming against him must make out his entire title.

" In the absence of any effectual disposition of the beneficial interest in personalty, the next of kin is entitled to it. and the person seeking to dispossess him of it is bound to prove a perfect title, and to rebut the *prima facie* case of the next of kin."

The foregoing, however, is to be taken in connection with the fact that the proof in that case showed the survival, for a brief space, of a child of Mr. Underwood; and that fact made a *prima facie* case for the representative of the child, which Wing was under the burden of overcoming by proving the existence of the condition upon which his title as legatee depended.

Nevertheless, the settled rule of law, as stated, governing the devolution of an estate as the legal consequence of the decease of its owner, would seem to furnish a strong foundation for the contention of the representative of the son in the case at bar.

At the same time, it is evident that, whilst the cases last

cited satisfactorily determine where the burden of proof lies and what is necessary to discharge its obligation, in cases where the plaintiff sues to recover the possession of property held by another under claim of title, and not as a mere trespasser or wrongdoer, none of them included in its decision the very question of this controversy: In whom vested the *prima facie* right upon proof of the death of the mother, regardless of the fact that the same evidence showed the death of the son in the same shipwreck? In other words, did the mother's next of kin take subject to displacement by proof of the son's survival? Or, did the son's next of kin succeed, subject to displacement by proof of the mother's survival?

Laboring under some divergency of opinion, we would have great difficulty in determining upon which of these parties the burden of proof lies, had Sophia Rhodes left no will. But, as there is a will under which her estate has been so far administered, to which we may look for a solution of the difficulty, and we are agreed upon the relations of the parties created thereby, we prefer to base our conclusion upon its provisions.

5. The husband of testatrix having died before her, it will be observed that item 2 of her will gives her entire estate absolutely to her son Eugene. Then follows item 3, containing the condition precedent to the bequest over for the benefit of the Young Women's Christian Home, and another for the husband's life, namely: "In the event of the death of my son Eugene Rhodes before the decease either of myself or of my husband, I then give," etc.

The condition is then repeated distinctly in the following form in item 4: "In the event of my becoming the survivor of both my husband Oliver Wheeler Rhodes, and of my son Eugene Rhodes, I then give, devise," etc.

The terms of the will, then, vesting the estate in Eugene Rhodes immediately upon testatrix's death, we agree that it raises a *prima facie* right in the personal representatives of the son, and imposes the burden upon her next of kin of displacing them by proof of his mother's survival.

Proof of that fact having failed, it follows that the representatives and next of kin of the son are entitled to the entire fund. The decree appealed from is, therefore, reversed, with costs to be paid out of the fund in controversy, and the cause will be remanded with direction to enter a decree in conformity with this opinion. *Reversed.*

An appeal to the Supreme Court of the United States was taken and perfected by the appellant Barbara Faul and the appellee, the Young Women's Christian Home.